B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Ronald E. Stadtmueller, as administrator of the Roni Hicks & Associates Employee Stock Ownership Plan and Trust dated January 1, 2013 | DEFENDANTS<br>Prairie Capital Advisors, Inc. |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>SULLIVAN HILL REZ & ENGEL, A PLC<br>James P. Hill, SBN 90478 / Gary B. Rudolph, SBN 101921<br>600 B Street, Suite 1700, San Diego, CA  92101<br>Phone No. (619) 233-4100 | **ATTORNEYS** (If Known) |

**PARTY** (Check One Box Only)
- [ ] Debtor
- [ ] Creditor
- [✓] Trustee
- [ ] U.S. Trustee/Bankruptcy Admin
- [ ] Other

**PARTY** (Check One Box Only)
- [ ] Debtor
- [ ] Creditor
- [ ] Trustee
- [ ] U.S. Trustee/Bankruptcy Admin
- [✓] Other

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
FOR TURNOVER OF FUNDS PAID, NEGLIGENCE, AND PROFESSIONAL NEGLIGENCE

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- [ ] 11 - Recovery of money/property - § 542 turnover of property
- [ ] 12 - Recovery of money/property - § 547 preference
- [ ] 13 - Recovery of money/property - § 548 fraudulent transfer
- [✓] 14 - Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- [ ] 21 - Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- [ ] 31 - Approval of sale of property of estate and of co-owner - § 363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- [ ] 41 - Objection / revocation of discharge - § 727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- [ ] 51 - Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- [ ] 66 - Dischargeability - § 523(a)(1),(14),(14A) priority tax claims
- [ ] 62 - Dischargeability - § 523(a)(2), false pretenses, false representation, actual fraud
- [ ] 67 - Dischargeability - § 523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- [ ] 61 - Dischargeability - § 523(a)(5), domestic support
- [ ] 68 - Dischargeability - § 523(a)(6), willful and malicious injury
- [ ] 63 - Dischargeability - § 523(a)(8), student loan
- [ ] 64 - Dischargeability - § 523(a)(15), divorce or separation obligation (other than domestic support)
- [ ] 65 - Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- [ ] 71 - Injunctive relief - reinstatement of stay
- [ ] 72 - Injunctive relief - other

**FRBP 7001(8) Subordination of Claim or Interest**
- [ ] 81 - Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- [ ] 91 - Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- [ ] 01 - Determination of removed claim or cause

**Other**
SS-SIPA Case – 15 U.S.C. §§ 78aaa *et.seq.*
- [ ] 02 - Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

- [ ] Check if this case involves a substantive issue of state law
- [ ] Check if a jury trial is demanded in complaint

- [ ] Check if this is asserted to be a class action under FRCP 23

Demand $  56,637.85

Other Relief Sought
Other damages, subject to proof

B1040

B1040 (Page 2) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>IntegratedMarketing.com, dba Roni Hicks & Associates | | BANKRUPTCY CASE NO.<br>19-04688-CL7 |
| DISTRICT IN WHICH CASE IS PENDING<br>Southern District of California | DIVISIONAL OFFICE<br>San Diego | NAME OF JUDGE<br>Hon. Christopher B. Latham |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | |
|---|---|
| /s/ Gary B. Rudolph | |
| DATE<br>July 29, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Gary B. Rudolph |

# INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and the defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and in the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature**. This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

B1040

1

2

3

4   SULLIVAN HILL REZ & ENGEL
    A Professional Law Corporation
5      James P. Hill, SBN 90478
       Gary B. Rudolph, SBN 101921
6      Kathleen A. Cashman-Kramer, SBN 128861
    600 B Street, Suite 1700
7   San Diego, California 92101
    Telephone:  (619) 233-4100
8   Fax Number: (619) 231-4372

9   Attorneys for Plaintiff, Ronald E. Stadtmueller, Chapter 7 Trustee

10              **UNITED STATES BANKRUPTCY COURT**

11              **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 12  In re | ) CASE NO. 19-04688-CL7 |
| 13  INTEGRATEDMARKETING.COM | ) Chapter 7 |
|     , dba RONI HICKS & | ) |
| 14  ASSOCIATES, | ) Adv. Pro. No. 20-90039-CL |
| 15                    Debtor. | ) |
| 16  RONALD E. STADTMUELLER, as | **COMPLAINT FOR TURNOVER OF** |
|     administrator of the Roni Hicks & | **FUNDS PAID, NEGLIGENCE, AND** |
| 17  Associates Employee Stock | **PROFESSIONAL NEGLIGENCE** |
|     Ownership Plan and Trust dated | ) |
|     January 1, 2013, | ) |
| 18 | ) |
| 19                    Plaintiff, | ) Dept.:5 |
|     v. | )      Hon. Christopher B. Latham |
| 20 | ) |
|     PRAIRIE CAPITAL ADVISORS, | ) |
| 21  INC., | ) |
| 22                    Defendant. | ) |

23          Comes now Plaintiff Ronald E. Stadtmueller ("Plaintiff"), the Chapter 7 Trustee

24  of the bankruptcy estate ("Estate") of IntegratedMarketing.com dba Roni Hicks &

25  Associates ("Debtor"), and administrator of the Roni Hicks & Associates Employee

26  Stock Ownership Plan, dated January 1, 2013, as amended by that First Amendment

27  and Restatement dated as of January 1, 2017 ("ESOP Plan") and the Roni Hicks &

28  Associates Employee Stock Ownership Trust dated January 1, 2013 ("ESOP Trust")

(collectively "ESOP"), alleges as follows:

## PARTIES

1.      On August 2, 2019 ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code")[1] in the U.S. Bankruptcy Court for the Southern District of California ("Court"), initiating the Chapter 11 case entitled In re IntegratedMarketing.com dba Roni Hicks & Associates, Case No. 19-04688-LA7 ("Bankruptcy Case"). Thereafter, on November 4, 2019, the case was converted to Chapter 7, and Ronald E. Stadtmueller was appointed Chapter 7 Trustee of the Estate. Pursuant to the ESOP Trust and Plan, Plaintiff has the authority to act as administrator of the ESOP.

2.      Plaintiff is informed and believes and thereon alleges that defendant Prairie Capital Advisors, Inc. ("Prairie") is an Illinois corporation formed under, and operating under, the laws of the state of Illinois.

3.      Pre-petition, and up until about May 15, 2019, TI Trust, Inc., formerly known as First Bankers Trust, Inc. ("TI") was the ESOP Trustee for the ESOP Trust. Effective May 15, 2019, TI was replaced as trustee with Miguel Paredes and Prudent Fiduciary Services, Inc. (collectively "Paredes"). Thereafter, on or about November 11, 2020, Paredes resigned as the ESOP Trustee for the ESOP Trust.

4.      Pursuant to Section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA") and to that certain agreement approved by this Court by order entered on October 27, 2020 (ECF #256), Plaintiff has the authority to bring claims on behalf of the ESOP, against third parties including, without limitation, Prairie.

## JURISDICTION

5.      This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 157 and 1334, as well as General Order 312-E of the U.S. District Court for the Southern District of California. This action is

---

[1] Unless otherwise indicated, all "Chapter" and "Section" references are to the Bankruptcy Code and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001 – 9037.

commenced pursuant to 11 U.S.C. Sections 541 and 542, and Rule 7001(1) of the Federal Rules of Bankruptcy Procedure ("FRBP").

6.      This Court may hear and determine this proceeding and enter appropriate orders and judgments pursuant to 28 U.S.C. § 157(b)(1) and (2).  This proceeding relates to the underlying Bankruptcy Case and is a core proceeding as set forth in 28 U.S.C. §§ 157(b)(1) and (2)(A), (E), and (O), in that it seeks to obtain turnover of property of the estate that was paid to the Defendant as well asserting a claim for damages from Defendant's professional negligence which claims affect the administration of the Estate.

7.      Pursuant to FRBP Rule 7008, Plaintiff hereby consents to the entry of final orders or judgment by the Court.  Additionally, pursuant to Local Bankruptcy Rule 7008-1, if the Court determines this proceeding is a core proceeding, Plaintiff hereby consents to the entry of final orders or judgment by the Court.

## STATEMENT OF FACTS

8.      Plaintiff is informed and believes and thereon alleges that Prairie was hired to, and in fact provided certain services to the ESOP Trustee and for the benefit of the ESOP Trust and its participants, including, but not limited to, valuation reports stating the hypothetical fair market value of the stock of the Debtor, as well as fairness opinion letters.

9.      In addition, Plaintiff is informed and believes and thereon alleges that at various times Prairie has given many valuation opinions and fairness opinion letters regarding the valuation of the Debtor's stock over the years; these values include but are not limited to: (1) in March 2014 Prairie valued the Debtor's stock at $109.18 per shar; (2) as of December 31, 2014 Prairie valued the Debtor's stock at $82.51 per share; (3) as of June 30, 2017 Prairie valued the Debtor's stock at $164.71 per share; and (4) as of December 31, 2017 Prairie valued the Debtor's stock at $1.21 per share.

10.      By way of background, Plaintiff is informed and believes and thereon alleges that the Debtor was founded in 1979 by Roni Hicks Clemens as a public

relations and advertising agency serving a wide range of industries including real estate.  In 1999, the Debtor was sold to Jane Carey Wheeler ("Ms. Wheeler") and Diane L. Gaynor McCue ("Ms. McCue") who then incorporated the Debtor as Integratedmarketing.com dba Roni Hicks & Associates.

11.    Plaintiff is informed and believes and thereon alleges that Debtor specialized in real estate community planning, marketing, and public affairs.

**A.     The March 2014 First Stock Sale Transaction.**

12.    Plaintiff is informed and believes and thereon alleges that, when Ms. Wheeler, her husband Stephen Wheeler, Ms. McCue, and her husband Steven McCue (collectively the "Sellers"), decided to retire, they structured a two stage sale of their shares in the Debtor to their employees, many of whom had been with the Debtor for more than 10 years.  The first stage of this process was to occur in 2014.

13.    Specifically, Plaintiff is informed and believes and thereon alleges that in March 2014 the Sellers owned all of the issued and outstanding shares of the common stock of the Debtor.  The first stage of the ESOP Transaction was set forth in the Stock Purchase Agreement dated March 13, 2014 ("First SPA") pursuant to which the Sellers sold 49,000 shares of the common stock to the ESOP Trust for the purchase price of $5,350,000.00 which is approximately $109.18 per share.   The Wheelers sold 36,750 shares for a purchase price of $4,012,500 and the McCues sold 12,250 shares for a purchase price of $1,337,500.  These shares of stock collectively represented a 49% interest in the Debtor.

14.    Plaintiff is informed and believes and thereon alleges that Prairie provided the valuation services, and issued the fairness opinion letter, which was relied on and utilized in establishing the value the stock in the First SPA.  Prairie opined that a fair price for the Debtor's stock, at the time of the First SPA was $109.18 per share.

15.    Pursuant to the Loan and Security Agreement dated March 13, 2014, ("First Acquisition Loan") First American Bank ("First American") provided

financing in the amount of $5,350,000 for the purchase of the Seller's shares of the common stock of the Debtor.  As noted above, at the time of the First Acquisition Loan, the Debtor's Board of Directors was comprised entirely of the Sellers and their family members.  All of First American's loan documents for the First Acquisition loan which provided financing for the purchase of the stock from the Sellers were executed by Ms. Wheeler as President and/or as the Chief Financial Officer of the Debtor.

16.    The First Acquisition Loan was all due and payable on March 1, 2019. In addition, it provided that the Debtor was required "to enter into employment contracts with Jane C. Wheeler and Diane Lori Gaynor-McCue, the terms of which shall in no event be less than the Term Loan Term;" e.g., to March 2019.  See section 9.18 [which also stated that the Debtor was to "provide Bank with the opportunity to review and disallow any other key management employment contracts prior to entering into any such contract."  This provision ensured that the Sellers remained in control of the Debtor for the Second Stage of the ESOP Transaction.

**B.    The June 30, 2017 Second Stock Sale Transaction.**

17.    Plaintiff is informed and believes and thereon alleges that, between the time of the 2014 transaction and the June 30, 2017, transaction ("Second SPA"), the Sellers continued to control the Debtor's board of directors.  Plaintiff is further informed and believes that Sellers' control included, but is not limited to, making decisions regarding payment of loans owed by the Debtor, deciding whether or not to incur new loans on behalf of the Debtor, and deciding to complete the sale of the Wheeler and McCue shares in 2017.  At this time, the Sellers collectively still owned 51% of the stock in the Debtor.

18.    On or about June 30, 2017, the Debtor entered the Second SPA between itself, TI, and the Sellers, for sale of the Sellers' remaining 51% interest in the Debtor's stock.  Plaintiff is informed and believes and thereon alleges that, prior to June 30, 2017, the Wheelers held 38,250 shares in the Debtor, and the McCues held

419135-v6

12,750 shares in the Debtor.

19.    The purchase price for this stock was agreed to be $8,400,000, based upon the value given to the shares of $164.71 per share.  This price per share was directly based upon the valuation report and fairness opinion letter provided by Prairie.  A true copy of this fairness opinion letter is attached hereto as Exhibit "A.[2]"  Of this amount, the Wheelers were to receive $6,300,000, and the McCues were to receive $2,100,000.  To fund the Second SPA, the Debtor was required to and in fact did apply to First American for a new loan, the proceeds of which would be used to pay to the ESOP Trust, who would then pay the Sellers the purchase price for the stock under the terms of the Second SPA.  Specifically, the Debtor borrowed the sum of $7,500,000 from First American to fund this transaction.  While the Debtor was required to obtain the loan to purchase the shares, the shares of stock purchased from the Sellers would then be in the name of the Trust, rather than in the name of the Debtor.

20.    The ESOP Trust governing the operation of the Plan provides in Section 2-3 that the ESOP Trustee may purchase stock in the Debtor "only at prices which do not exceed the fair market value of the shares purchased, as determined by the Trustee based upon a valuation by an independent appraiser."

21.    The Second SPA also provided that the Debtor would lend to the Trust the sum of $6,448,978.00, from which the Trust would pay the obligations to the Sellers under the terms of the Second SPA.  A separate ESOP Loan Agreement was prepared and signed which documented this loan.

22.    The Second SPA closed on or about June 30, 2017, at which time the following payments were made from the ESOP Trust, from the proceeds of the First American loan, directly to the Sellers, the sum of $4,836,733.50 to the Wheelers, and

---

[2] Pursuant to subpoena, two different versions of a document purporting to be a fairness opinion letter, both dated June 30, 2017 and both signed by Defendant, have been produced in the underlying Chapter 7 case.  Plaintiff is unclear which one is the accurate and final fairness opinion letter, or why there are two of them and, as a result, attaches both of them here, as Exhibits "A-1" and "A-2."

419135-v6                                                    - 6 -

the sum of $1,612,244.50 to the McCues. The balance of the purchase price was to be paid to the Sellers through two notes: one payable to Wheeler in the amount of $1,677,384.48 and one payable to McCue $558,886.51.

23. All the loans described above were based upon, and in fact relied exclusively upon, the valuation of the Debtor's stock, and the fairness opinion provided by Prairie.

**C.    Discovery of Overvaluation of the Debtor's Stock.**

24. Commencing in March 2019, the Debtor gave notice to the Sellers and others that the Debtor believed that the valuation of the Debtor's stock, as established by Prairie, had been over-valued by a significant amount. Specifically, the Debtor notified the parties that the Sellers, First American, TI, and Prairie knew, or should have known before the Second SPA closed, that the stock price was too high, meaning the acquisition loan from First American was too high; that the Debtor would be unable to sustain payments on that loan and/or remain within the stated debt ratio; and that the price paid for the stock was more than fair market value for the stock. On September 30, 2019, the Debtor, through its counsel, and Paredes each sent letters to counsel for the Sellers detailing, among other things, the knowledge the Sellers had about the impending loss of the Debtor's key client before the Second SPA, and numerous claims that Sellers breached warranties provided and numerated in section 6.5(a) and (b) and 6.6 of the Second SPA. Copies of these letters were also sent to TI and are attached hereto as Exhibits "B" and "C".

25. Plaintiff is informed and believes and thereon alleges that the Sellers, First American, TI and Prairie knew, or should have known before the Second SPA closed, that the stock price was too high, meaning the amount of the acquisition loan from First American was greater than it should have been and the Debtor would be unable to sustain payments on that loan and/or remain within the stated debt ratio.

26. Plaintiff is also informed and believes and thereon alleges that Paredes also sent a letter to various parties asserting the overvaluation of the Debtor's stock in

2017, including the fact that certain information was not appropriately and/or sufficiently disclosed by the Sellers to the predecessor trustee of the ESOP, and that information was known or knowable to the Sellers at the time of the sale. His letter further states that "such information concerned a material adverse change in the financial condition and prospects of the [Debtor] . . ." which "resulted in the ESOP paying more than fair market value for the stock. This loss to the ESOP has been calculated by Mr. Paredes to be between $4,236,000 and $4,447,000." See Exhibit "C" attached hereto.

27. Plaintiff is informed and believes and thereon alleges that the Debtor's borrowing obligations to both First American and the ESOP Trust and Plan were determined in full by the valuation placed upon the stock by Prairie.

28. Plaintiff is further informed and believes and thereon alleges that the sale price for the purchase of the Sellers' stock was too high and this directly resulted in an unrealistic imposition on the Debtor's cash flow, ultimately resulting in its filing for Chapter 11 protection on August 2, 2019.

29. Plaintiff is further informed and believes and thereon alleges that, prior to the closing of the Second SPA, there were clear indicia that the projections of future business made by the Sellers were grossly overstated resulting in the excess valuation of the stock and other problems which made the sale extremely imprudent from the position of the Debtor and the ESOP Trustee. These indicia and problems were known to the Sellers and either were known by, or should have been known by, TI, Prairie, and First American.

30. Plaintiff is informed and believes that Prairie set the per-share value for the Second SPA by taking a completed business year's cash income and discounting the expected future receipts to reflect the uncertainties of the market in which the Debtor operates.

31. Plaintiff is informed and believes and thereon alleged that Prairie's resulting "enterprise value" appraisal for a per-share of the Debtor's stock performed

419135-v6

by Prairie showed the per share price of the stock for the Second SPA should be $164.71.

32.     Plaintiff is further informed and believes and thereon alleges that the facts demonstrate that the per-share price of the stock in the Second SPA price was too high, and therefore the resulting debt incurred by the Debtor was too high, , for several reasons, including the following:

a. Between June 30, 2017, and December 31, 2017, Prairie's price per share valuation of the Debtor's stock had declined from $164.71 to $1.21.

b. At the time of the First SPA, Prairie applied a 15.5% cash flow discount; when Prairie again valued the Debtor in December 2016, it used a 16.5% discount.  Nevertheless, six months later, at a time when the Debtor was taking on a very large amount of debt and changing over its entire management team, Prairie lowered the future cash flow discount to 15.5%, meaning the price per share estimate came out higher than it should have been(and the estimate of the future hazards to the Debtor was too low).

c. There was additional information about adverse events before the Second SPA closed which should have led Prairie to a far more conservative valuation of the stock.  There existed issues adversely affecting the future of the customer contracts that Sellers should have disclosed to all parties to the Second SPA transaction.  This included, but was not limited to, the knowledge that Newland Communities, which comprised more than 60% of the Debtor's sales in 2016, had decentralized all of its marketing operations nationwide, and was no longer giving the debtor new projects.

d. The over-valued stock directly resulted in too large a loan from First American, requiring the Debtor to make excessively high

monthly payments to First American. This meant a loss of available cash the Debtor could otherwise have used to operate and promote its business operations. This also meant the Debtor suffered a continual cash poor condition and that the Debtor lost valuable customers as it was not able to induce them to stay.

33. Plaintiff is further informed and believes, and thereon alleges that at the time of its valuation (between March and June 2017), Prairie knew or should have known that the Sellers had a direct and significant conflict of interest in connection with the Second SPA, since they were acting as both the sellers of the 51% stock interest in the Debtor, and as the agents for the Debtor, being the ones in control of the Debtor's stock and its board of directors. Specifically, Prairie knew or should have known that the Sellers' goal then was to obtain the highest possible per-share stock price, and that, for this reason (among others) the information Sellers provided to Prairie in connection with the valuation and fairness opinion should have been greatly scrutinized.

34. Plaintiff is further informed and believes and thereon alleges that Prairie knew or should have known, at the time it was conducting its valuation and fairness opinion in early 2017, that (a) the participants in the ESOP Trust, namely, employees of the Debtor, would not realize any value for their shares of stock until after the loan to First American had been paid in full; and (b) the ESOP Trust had no assets of its own from which to pay down the First American loan.

35. Plaintiff is informed and believes and thereon alleges that Prairie was paid the sum of approximately $56,637.85 or more for the valuation and fairness opinion in connection with the Second SPA.

36. Plaintiff is informed and believes and thereon alleges that Prairie is a "party in interest" within the meaning of Section 3(14) of ERISA as a service provider to the ESOP. Prairie knew or should have known that its overvaluation of the stock purchased by the ESOP would result in the ESOP paying a purchase price in excess of

"adequate consideration" as that term is defined in Section 3(18) of ERISA causing the ESOP to engage in a "prohibited transaction" under Section 406 of ERISA. As a "party-in-interest" to the ESOP, Prairie is subject to a claim by Plaintiff for "appropriate equitable relief" under Section 502(a)(3) of ERISA.

### FIRST CLAIM FOR RELIEF

### (For Turnover of Funds Received)

37.    Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 36, inclusive, as though fully set forth herein.

38.    As set forth above, Plaintiff is informed and believes and thereon alleges that Prairie was paid the sum of approximately $56,637.85, or more, subject to proof at the time of trial, for the valuation and fairness opinion in connection with the Second SPA.

39.    Such payment was made pursuant to that certain written agreement between Prairie, on the one hand, and TI, as the then-existing ESOP Trustee, for the benefit of the ESOP Trust and Plan and participants. A true and correct copy of this agreement is attached hereto as Exhibit "D."

40.    As a result of Prairie's negligent actions, as described herein, Plaintiff is entitled to "appropriate equitable relief" under Section 502(a)(3) of ERISA, including reimbursement by Prairie of the full amount paid to Prairie for the valuation and fairness opinion services rendered.

41.    By reason of the foregoing, Plaintiff seeks a judgment against Defendant requiring it to turn over the full amount which it was paid in connection with the Second SPA, in an amount subject to proof at the time of trial.

### SECOND CLAIM FOR RELIEF

### (For Negligence)

42.    Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 41, inclusive, as though fully set forth herein.

/ / /

419135-v6

- 11 -

43.    As set forth above, Prairie was negligent when it prepared its valuation report dated June 30, 2017, and when it gave its fairness opinion letter, in connection with the Second SPA.

44.    The results of this negligence include, but are not limited to: (a) the fact that the participants in the ESOP Trust, namely, employees of the Debtor, have not realized any value for their shares of stock because the Debtor was never able to repay the loan to First American; and (b) the crushing debt resulting from the overpriced stock purchase caused the Debtor to file for bankruptcy protection and, ultimately, shut down its business and discharge all of its employees.

45.    As a direct and proximate cause of Defendant Prairie's negligence, the ESOP Trust has been damaged in an amount subject to proof at the time of trial.

<u>**THIRD CLAIM FOR RELIEF**</u>

**(Professional Negligence)**

46.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 45, inclusive, as though fully set forth herein.

47.    Plaintiff is informed and believes and thereon alleges that Prairie provided professional valuation services to Plaintiff's predecessor in interest, TI, in connection with the Second SPA.

48.    Defendants owed a duty of professionalism in connection with its engagement (Exhibit "D").

49.    Plaintiff is further informed and believes and thereon alleges that Defendant Prairie had a duty to use such skill, prudence, and diligence as other members of its profession commonly possess and exercise with regard to providing such services.  As alleged in paragraphs 8-36 above, Defendant Prairie breached that duty and failed to exercise the appropriate degree of skill, prudence, and diligence in preparation of the subject valuation reports and fairness opinions, and that such failure resulted in significant damage to the ESOP Trust and Plan, subject to proof at the time of trial.

50.    Prairie breached its duties by, including but not limited to: (a) relying on information provided to it by a conflicted party (i.e., the Sellers); (b) failing to apply the correct discount rate relative to the various risks shown by the information provided to Prairie; (c) failing to perform an adequate debt capacity analysis; (d) failing to insist on a direct interview with the Debtor's major customer, Newland, to confirm information received; (e) relying on incomplete or incorrect material assumptions; and (f) failing to perform an analysis that the valuation was fair from a financial point of view.

51.    The result of Defendant's breaches of these duties was the overvaluation of the Sellers' 51% interest in the stock of the Debtor, which resulted in the incurrence of crippling debt that ultimately led the Debtor to file for bankruptcy protection, followed by ceasing all operations, which included all of the participants of the ESOP Trust and Plan losing any value they had or may had had in the stock in the Debtor.

52.    As a direct and proximate cause of Defendant's negligence, the ESOP Trust has been damaged in an amount subject to proof at the time of trial.

WHEREFORE, Plaintiff prays that the Court enter Judgment against Defendant and in favor of the Plaintiff as follows:

1.    <u>On the First Claim for Relief:</u>

    a.    Ordering Defendant to turn over the funds that Defendant was paid for its engagement in connection with the Second SPA, which the Plaintiff believes is approximately at least $56,637.85, subject to proof at trial; and

    b.    Awarding such other and further relief as this Court may deem just and proper.

2.    <u>On the Second Claim for Relief:</u>

    a.    For damages based on Defendant's negligence in an amount subject to proof at the time of trial.

    b.    For pre-judgment interest at the legal rate.

1        c.    For such other and further relief and fees and cots as deemed

2        necessary and proper by this Court.

3       3.   <u>On the Third Claim for Relief</u>:

4        a.    For damages based on Defendant's professional negligence in an

5        amount subject to proof at the time of trial.

6        b.    For pre-judgment interest at the legal rate.

7        c.    For such other and further relief and fees and cots as deemed

8        necessary and proper by this Court.

9

10    Dated: July 29, 2021        SULLIVAN HILL REZ & ENGEL
          A Professional Law Corporation

11

12            By:   */s/ Gary B. Rudolph*

13               James P. Hill

14               Gary B. Rudolph
           Kathleen A. Cashman-Kramer

15            Attorneys for Plaintiff, Ronald E.
        Stadtmueller, Plan Administrator of the Roni

16            Hicks & Associates Employee Stock
        Ownership Plan and Trust dated January 1,

17            2013

18

19

20

21

22

23

24

25

26

27

28

1

2

## Exhibit Table

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| **A¹** | Fairness opinion letter dated June 30, 2017 from Prairie | 16-20 |
| **A²** | Fairness opinion letter dated June 30, 2017 from Prairie | 21-28 |
| **B** | Letter dated September 30, 2019 from William Fennell | 29-38 |
| **C** | Letter dated September 30, 2019 from Miguel Paredes | 39-42 |
| **D** | Engagement agreement dated March 31, 2017 between Prairie and TI | 43-47 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

419135-v6

# EXHIBIT A1

PRAIRIE

June 30, 2017
First Bankers Trust Services, Inc.
Not in its corporate capacity, but solely in its capacity as
Trustee of Roni Hicks & Associates
Employee Stock Ownership Trust
2321 Koch's Lane
PO Box 4005
Quincy, IL 62305-4005

Dear Trustee:

Prairie Capital Advisors, Inc. ("Prairie") has been retained as an independent financial advisor to First Bankers Trust Services, Inc. in its capacity as Trustee ("Trustee") of the IntegratedMarketing.com d/b/a Roni Hicks & Associates (the "Company") Employee Stock Ownership Plan (the "ESOP"), to conduct an analysis of a proposed transaction involving the acquisition of 51.0% of the common stock (the "ESOP Shares") of the Company by the ESOP Trust.

It is our understanding that First Bankers Trust Services, Inc., not in its corporate or individual capacity, but solely in its capacity as ESOP Trustee is contemplating a transaction whereby the ESOP Trust will acquire fifty-one percent of the issued and outstanding common stock of the Company from two shareholders in a leveraged transaction. Pursuant to the Stock Purchase Agreement (the "SPA") dated June 30, 2017 (the "Closing Date"), the ESOP Trust will purchase 51,000 shares of common stock from Jane Wheeler and Stephen W. Wheeler, as wife and husband, and Diane Gaynor-McCue, and Steven F. McCue, as wife and husband (each a "Seller" and collectively the "Sellers") for $8,400,000 (the "ESOP Purchase Price") or $164.71 per share (the "ESOP Purchase Price Per Share")(the "ESOP Transaction").

The aggregate price to be paid to the Company's shareholders for the Shares is $8,400,000, through use of bank and seller financing. At Closing, the Company will borrow $7,850,000 from First American Bank (the "FAB Term Loan"), of which $7,500,000 will be in the form of a loan and up to $350,000 will be in the form of a working capital revolving loan facility. We understand that approximately $1,200,000 of the proceeds of the FAB Term Loan is proposed to be used to refinance the current outstanding debt owed to FAB and the balance ($6,448,978) will be advanced by the Company to the ESOP to provide the funds to purchase the stock from Ms. Wheeler and Gaynor. The FAB Term Loan will require 60 monthly principal payments plus based upon an 84 month amortization schedule. The FAB Term Loan shall bear interest at 30-Day LIBOR plus 400 basis points. The revolving loan will amortize over 12 months and pay interest at Index plus 275 basis points.

The remaining purchase price of $1,951,022 shall be paid in seller financing (the "Seller Notes"). The Seller Notes are proposed to be paid over a 30-year mortgage amortization schedule with interest at 7.0% per annum, but "interest only" payments are proposed to be made commencing on December 31, 2017, and continuing until December 30, 2030. Thereafter, commencing on December 31, 2031, and continuing until December 31, 2046, the ESOP will pay annual installments of principal and interest until the Seller Notes are paid in full. The Company has covenanted to use its best efforts to refinance and pay off the Seller Notes

Prairie Capital Advisors, Inc.
Atlanta | Boston | Cedar Rapids | Chicago | Louisville | Oakbrook Terrace
www.prairiecap.com
Securities offered through Prairie Capital Markets, LLC

Exhibit A1 - Page 17

First Banekrs Trust Services, Inc.
Page 2

on or before January 31, 2019 (when the Company expects to elect to be taxed as a Subchapter-S Corporation).

At Closing, the Company will loan $6,448,978 (the "New ESOP Note") to the ESOP Trust to be used for the ESOP's purchase of the ESOP Shares. The current ESOP Loan is approximately $3,900,000 (the "Existing ESOP Loan") will continue to be repaid in accordance with its terms. The New ESOP Note is proposed to be repaid in annual installments of interest-only at 2.68% until December 31, 2030, when the Existing ESOP Loan is scheduled to be repaid. Thereafter, commencing December 31, 2031, the New ESOP Loan will begin amortizing principal and interest, with a final payment due December 31, 2046.

You have specifically asked us to render a written opinion (the "Opinion") as to:

1. Whether the ESOP Purchase Price for the ESOP Shares does not exceed the Fair Market Value of the ESOP Shares (as such terms used for adequate consideration purposes under section 3(18) of ERISA) determined as of the Closing Date. The term Fair Market Value is defined as the amount at which the ESOP Shares might exchange between a willing buyer and a willing seller assuming terms similar to those reflected in the Transaction, each having reasonable knowledge of all relevant facts, neither being under compulsion, and with equity to both parties;

2. Whether the overall Transaction is fair to the ESOP from a financial point of view.

In developing our Opinion, we have visited the Company's San Diego, California facility with the Trustee, interviewed management, reviewed various records and documents for the Transaction including:

- Stock Purchase Agreement dated June 30, 2017 between the Sellers, the Company and the Trustee;

- Stock Pledge Agreement dated June 30, 2017 between the Company and the Trustee;

- Due Diligence Memorandum dated June 30, 2017;

- ESOP Note dated June 30, 2017 between the ESOP and the Company;

- Loan and Security Agreement dated June 30, 2017 between the Company and First American Bank;

- Term Note Agreement dated June 30, 2017 between the Company and First American Bank;

- Revolving Note Agreement dated June 30, 2017 between the Company and First American Bank;

- Internally prepared financial statements for the five year period ending December 31, 2016;

First Banekrs Trust Services, Inc.
Page 3

- Internally prepared interim financial statements for the four-month periods ending April 30, 2017 and April 30, 2016;

- Other documents deemed relevant.

We have also considered and reviewed various other factors and documents deemed to be appropriate in evaluating the Transaction and related agreements taken as a whole. These factors include, but are not limited to, the following:

- The history and nature of the business;

- The current economic environment, in general, and the specific economic factors impacting firms operating in the Company's industry;

- Management's assessment of the historical, current, and prospective competitive environment in which the Company operates;

- Costs of capital as reflected in the current markets for debt and equity securities;

- Valuation factors inferred from transactions involving fractional and/or 100% interests in firms which operate in the same or similar business segments as the Company, and for which public information is available;

- Review of the ten year financial forecast prepared by management;

- Management's assessment of meeting projected earnings estimates;

- And other factors that were deemed relevant in developing our Opinion.

Based on the foregoing, as of June 30, 2017, the Transaction closing date, our Opinion is:

1. The ESOP Purchase Price to be paid by the ESOP for the ESOP Shares pursuant to the Transaction does not exceed the Fair Market Value (as such term is used for adequate consideration purposes under section 3(18) of ERISA) of such ESOP Shares as of the Closing Date;

2. The terms and conditions of the Transaction are fair to the ESOP from a financial point of view, considered in the context of the Transaction taken as a whole.

In completing this engagement, we have relied on information provided by the Company including, but not limited to, financial statements, projections, product information, facilities

First Banekrs Trust Services, Inc.
Page 4

descriptions, employee data, and other information as may have been requested. We have accepted this information as being accurate without independent verification. However, we have exercised our independent judgment in evaluating this information, and we have not relied on information that we have determined to be inadequate or incomplete.

We have not investigated the title to or any disclosed or undisclosed liabilities against either the assets or equity securities of the Company. In accordance with recognized professional ethics, our fees for this service are not contingent upon the opinions expressed in this letter, and neither Prairie nor any of its employees has a present or intended financial interest in the Company.

This opinion letter is solely for the use and benefit of the Trustee, and any summary of or reference to the Opinion or any other reference to Prairie by the Company in connection with the Transaction will be subject to Prairie's prior review and written approval, which shall not be unreasonably withheld; provided, however, the law firm Schatz Brown Glassman LLP is granted permission to rely on this letter solely in connection with any legal counseling which it is rendering to the Trustee with respect to the Transaction.

Respectfully submitted,

*Prairie Capital Advisors, Inc.*

_____
Prairie Capital Advisors, Inc.

# EXHIBIT A2



June 30, 2017

First Bankers Trust Services, Inc.
Not in its corporate capacity, but solely in its capacity as
Trustee of Roni Hicks & Associates
Employee Stock Ownership Trust
2321 Kochs Lane
PO Box 4005
Quincy, IL 62305-4005

Dear Trustee:

Prairie Capital Advisors, Inc. ("Prairie") has been retained by First Bankers Trust Services, Inc.  (the "Trustee" or "You"), not in its corporate capacity but solely in its capacity as the Trustee of Roni Hicks & Associates Employee Stock Ownership Trust (the "Trust") established under the Roni Hicks & Associates Employee Stock Ownership Plan (the "Plan", and together with the Trust, the "ESOP"). In accordance with your authorization, we have conducted an analysis of a proposed transaction described in the next succeeding paragraphs.  All capitalized terms used herein shall have the meaning set forth in the SPA (as defined below) unless otherwise defined herein.

The ESOP currently owns 49,000 shares or 49.0% of the total issued and outstanding shares of common stock of IntegratedMarketing.com, a California corporation d/b/a Roni Hicks & Associates (the "Company").

Jane Carey Wheeler and Stephen W. Wheeler, as wife and husband, and Diane Gaynor-McCue, and Steven F. McCue, as wife and husband (each a "Seller" and collectively the "Sellers") own 51,000 of the issued and outstanding shares of the common stock of the Company.  The Sellers desire to sell 51,000 shares of the common stock ("Shares") to the Trustee, and the Trustee desires to purchase the Shares from the Sellers, on the terms and subject to the conditions set forth in the Stock Purchase Agreement (the "Stock Purchase Agreement" or "SPA") dated June 30, 2017 (the "Transaction").

The aggregate purchase price to be paid by the Trust to the Sellers is approximately $164.71 per share or $8,400,000 on an aggregate basis (the "Purchase Price").

At Closing, the Company will obtain a credit facility in the aggregate amount of $7,850,000 from First American Bank (the "Bank"):

- Term Loan in the amount of $7,500,000 bearing annual interest at 30 day LIBOR +400 basis points, commencing on August 1, 2017 and on the first day of each calendar month thereafter,

Prairie Capital Advisors, Inc.

Atlanta | Boston | Cedar Rapids | Chicago | Louisville | Oakbrook Terrace

www.prairiecap.com

Securities offered through Prairie Capital Markets, LLC

First Bankers Trust Services, Inc.
Not in its corporate capacity, but solely in its capacity as
Trustee of Roni Hicks & Associates
Employee Stock Ownership Trust
Page 2

for a period of sixty (60) months (the "Term Loan Term"), the Borrower shall repay the principal amount of the Term Loan outstanding from time to time in sixty consecutive monthly principal payments in the amount of $89,285.21 plus accrued and unpaid interest (such accrued and unpaid interest based on 84 month amortization).  At the end of the Term Loan Term, any outstanding principal of and accrued and unpaid interest on the Term Loan, if not sooner paid in full, shall be due and payable in full on July 1, 2022. The Term Note may be voluntarily prepaid at any time and from time to time prior to maturity at the option of the Borrower, without premium, fee, or discount.

- Revolving Loan up to the amount of $350,000 bearing annual interest at 30 day LIBOR +275 basis points.  If and to the extent that the outstanding principal amount of the Revolving Loan shall at any time exceed the limits, the Borrower shall repay the Revolving Loan in the amount of such excess.  In addition, the Revolving Loan may be repaid at any time at the option of the Borrower without premium, fee, or discount.

The remaining purchase price of $1,951,022 shall be paid in seller notes (the "Seller Notes"). The Seller Notes are proposed to be paid as follows with interest at 7.0% per annum: (a) "interest only" payments are proposed to be made commencing on December 31, 2017, and continuing until December 30, 2030, and (b), commencing on December 31, 2031, and continuing until December 31, 2046, the ESOP will pay equal annual installments of principal and interest pursuant to a 16-year mortgage amortization schedule until the Seller Notes are paid in full.  The Company has agreed to use commercially reasonable efforts to refinance the balance of the Seller Notes no later than January 31, 2019.

At Closing, the Company will loan $6,448,978 (the "ESOP Loan") to the Trust to be used for the ESOP's purchase of 39,155 of the Shares (the "Pledged Shares"). The ESOP Loan is proposed to be repaid in annual installments of interest-only at 2.68% per year until December 31, 2030. Thereafter, commencing December 31, 2031, the ESOP Loan will begin amortizing principal and interest, equal to 2.68% per year, with a final payment due December 31, 2046.  The Trust may prepay this Loan, in part or in full, at any time and from time to time, without penalty or premium.

<u>Price Protection:</u> To mitigate the impact of the Transaction on the value of shares of Company stock allocated to certain participants in the Plan ("Protected Participants"), the Company and the Trustee agree to establish a floor price for said shares held by the Trust immediately prior to the Closing Date ("Pre-Closing Shares").  Distributions made from the Plan to Protected Participants on or before the fifth (5th) anniversary of the Closing Date (the "Distribution Period") will be made in the form of Company shares. When Protected Participants put Pre-Closing Shares to the Company, the Company shall pay a per-share purchase price ("Price Protected Amount") equal to the per-share value of a Company share under the Plan determined by the Trustee as of the last day of the Plan year immediately preceding the Plan year of distribution.  The Price Protected Amount for any Pre-Closing Shares will be determined by taking the Company share value as of the prior Plan year end and adjusting the value to eliminate the interest bearing debt taken on by the Company and the Trust to fund the Transaction.

First Bankers Trust Services, Inc.
Not in its corporate capacity, but solely in its capacity as
Trustee of Roni Hicks & Associates
Employee Stock Ownership Trust
Page 3

<u>Composition of Board of Directors:</u>  Within six months following the Closing Date, the Company will nominate an "Independent Member" for its Board of Directors, who shall be presented to the Trustee for its consideration and vote.  Within twelve months following the Closing Date, the Company will nominate a second Independent Member for its Board of Directors, who shall be presented to the Trustee for its consideration and vote.

<u>S-Corporation Election:</u> The Company and the Trustee shall take, or cause to be taken, all actions reasonably necessary to for the Company to qualify to be taxed as an S Corporation effective as of January 1, 2019.  The Company, the Trustee, and each Seller shall not take any action that would cause the Company to cease to qualify as an S corporation on or after January 1, 2019.

You have specifically asked us to render written opinions (the "Opinion") as to:

1.  Whether the consideration to be paid by the Trust for the Shares is not greater than the Fair Market Value (as the term is used in the definition of "adequate consideration" as set forth in Section 3(18) of the Employee Retirement Income Security Act of 1974, as amended) of the Shares determined as of the Closing Date;

2.  Whether the interest rate paid by the Trust under the ESOP Note and Seller Notes does not exceed a reasonable rate of interest, considered in the context of the Transaction taken as a whole;

3.  Whether the terms of ESOP Loan, the Seller Loans, the ESOP Note and the Seller Notes are at least as favorable for the Trust as would be terms of a comparable loan resulting from arm's-length negotiations between independent parties and;

4.  Whether the Transaction contemplated by that certain Stock Purchase Agreement are fair to the Trust, from a financial point of view, considered in the context of the Transaction taken as a whole.

In developing our Opinion, we have interviewed the Company's management and reviewed various materials. These materials reviewed include, but are not limited to, the following:

- Stock Purchase Agreement dated June 30, 2017 among the Sellers, the Company and the Trustee;

- ESOP Loan Agreement dated June 30, 2017 between the Company and the Trustee;

- ESOP Stock Pledge Agreement dated June 30, 2017 between the Company and the Trustee;

- Due Diligence Memorandum dated June 26, 2017;

First Bankers Trust Services, Inc.
Not in its corporate capacity, but solely in its capacity as
Trustee of Roni Hicks & Associates
Employee Stock Ownership Trust
Page 4

- ESOP Note dated June 30, 2017 issued by the ESOP in favor of the Company (including the attached amortization schedule);

- Loan and Security Agreement dated June 30, 2017 between the Company and First American Bank;

- Term Note dated June 30, 2017 issued by the Company in favor of First American Bank;

- Revolving Note dated June 30, 2017 issued by the Company in favor of First American Bank;

- Subordination Agreement dated June 30, 2017 between the Company, Jane Carey Wheeler, Stephen W. Wheeler, Diane L. Gaynor-McCue and Steven F. McCue, and First American Bank;

- Collateral Assignment of ESOP Loan Documents dated June 30, 2017 between the Company and First American Bank, and consented to by the Trustee;

- Guaranty dated June 30, 2017  executed by Jane Carey Wheeler and Diane L. Gaynor-McCue in favor of First American Bank;

- Solvency Certificate dated June 30, 2017 executed by the Company;

- Seller Credit Agreement dated June 30, 2017 between the Trustee and Jane Carey Wheeler and Stephen W. Wheeler;

- Seller Credit Agreement dated June 30, 2017 between the Trustee and Diane L. Gaynor-McCue and Steven F. McCue;

- Seller Stock Pledge Agreement dated June 30, 2017 between the Trustee and Jane Carey Wheeler and Stephen W. Wheeler ;

- Seller Stock Pledge Agreement dated June 30, 2017 between the Trustee and Diane L. Gaynor-McCue and Steven F. McCue;

- Seller Note dated June 30, 2017 issued by the Trust in favor of Jane Carey Wheeler and Stephen W. Wheeler (including the attached amortization schedule);

First Bankers Trust Services, Inc.
Not in its corporate capacity, but solely in its capacity as
Trustee of Roni Hicks & Associates
Employee Stock Ownership Trust
Page 5

- Seller Note dated June 30, 2017 issued by the Trust in favor of Diane L. Gaynor-McCue and Steven F. McCue (including the attached amortization schedule);

- Assignment and Stock Power dated June 30, 2017 executed by Jane Wheeler and Stephen W. Wheeler;

- Assignment and Stock Power dated June 30, 2017 executed by Diane Gaynor-McCue and Steven McCue;

- Board Resolutions approving the Transaction;

- Draft Flow of Funds Schedule and Disbursement Authorization dated June 30, 2017;

- Amended and Restated Bylaws of IntegratedMarketing.com d/b/a Roni Hicks & Associates;

- Financial Statement Certificate dated June 30, 2017;

- Internally prepared financial statements for the five year period ending December 31, 2016;

- Internally prepared interim financial statements for the four-month periods ending April 30, 2017 and April 30, 2016;

- Aaron Smith and Todd Ochsner Employment Agreements dated June 30, 2017;

- Other related documents we deemed relevant in developing our Opinion.

In addition to materials reviewed, we have considered various factors in developing our Opinion. These factors include, but are not limited to, the following:

- The history and nature of the Company's business, including its strengths and weaknesses;

- Any adjustments to the Company's historical financial statements;

- The current economic environment, in general, and the specific economic factors bearing on firms involved in the Company's industry;

- The Company's customer base;

First Bankers Trust Services, Inc.
Not in its corporate capacity, but solely in its capacity as
Trustee of Roni Hicks & Associates
Employee Stock Ownership Trust
Page 6

- Management's assessment of the historical and current operations, competitive environment and strategic outlook for the Company;

- The process undertaken with regard to the review, negotiation, and approval of the Transaction;

- Costs of capital and rates of return as reflected in the current markets for debt and equity securities and the appropriate discounts or premiums based on the proposed ownership structure of the Company;

- Economic and industry information from Capital IQ, Duff & Phelps, and Government Agencies; and

- Other factors such as financial studies, analyses, and inquiries we deemed relevant in developing our Opinion.

Based on the foregoing, as of the date of this letter, our Opinion is:

1. The consideration to be paid by the Trust for the Shares is not greater than the Fair Market Value (as the term is used in the definition of "adequate consideration" as set forth in Section 3(18) of the Employee Retirement Income Security Act of 1974, as amended) of such Shares determined as of the Closing Date;

2. The interest rate paid by the Trust under the ESOP Note and the Seller Notes does not exceed a reasonable rate of interest, considered in the context of the Transaction taken as a whole;

3. The terms of the of the ESOP Loan, the Seller Loans, the ESOP Note and the Seller Notes are at least as favorable for the Trust as would be terms of a comparable loans resulting from arm's-length negotiations between independent parties; and

4. The Transaction contemplated by that certain Stock Purchase Agreement are fair to the Trust, from a financial point of view, considered in the context of the Transaction taken as a whole.

In completing this engagement, we have relied on information provided by the Company including, but not limited to, financial statements, projections, product information, facilities descriptions, employee data, and other information as may have been requested. This information has been accepted as being accurate without independent verification by us. However, we have exercised our independent judgment in evaluating this information, and we have not relied on information that we have determined to be inaccurate or incomplete. We have not investigated title matters to or any disclosed or undisclosed liabilities with respect to either the assets or equity securities of the Company.

First Bankers Trust Services, Inc.
Not in its corporate capacity, but solely in its capacity as
Trustee of Roni Hicks & Associates
Employee Stock Ownership Trust
Page 7

The opinion letter is furnished solely for your benefit and may not be relied on by any other person without our express, prior written consent. Such authorization will not be unreasonably withheld. In accordance with recognized professional ethics, the fees for this service are not contingent on the Opinion expressed herein; and neither Prairie nor any of its employees has a present or intended financial interest in the Company or the other parties to the Transaction.

Respectfully submitted,

*Prairie Capital Advisors, Inc.*

Prairie Capital Advisors, Inc.



# LAW OFFICE OF WILLIAM P. FENNELL
A Professional Law Corporation

William P. Fennell *

_____
Of Counsel
Melissa A. Blackburn Joniaux
Charles F. Bethel

*Licensed in Colorado

600 West Broadway, Suite 930
San Diego, CA 92101
Tel: (619) 325-1560
Fax: (619) 325-1558
William.Fennell@fennelllaw.com

September 30, 2019


Howard J. Levine, Esq.
John A. Simon
**Drinker Biddle & Reath LLP**
191 North Wacker Drive, Suite 3700
Chicago, IL 60606-1698

Re:     Notification of Claims for Indemnity Under June 30, 2017 Stock Purchase Agreement as Against Jane Carey Wheeler, Stephen W. Wheeler, Diane L. Gaynor-McCue and Steven F. McCue

Gentlemen:

We are writing on behalf of our client, Integratedmarketing.com d/b/a Roni Hicks & Associates, as debtor in the matter *In re Integratedmarketing.com*, So. Dist of CA. Bk Case No. 19-04688 ("Roni Hicks" or "the Company") for the purpose of notifying of claims arising out of the March 13, 2014 and June 30, 2017 Stock Purchase Agreements (the "SPAs" collectively) entered into between Jane Carey Wheeler, Stephen W. Wheeler, Diane L. Gaynor-McCue and Steven F. McCue (the "Sellers"), the Company and First Bankers Trust Services, Inc. ("FBTS") as the  Trustee of the Roni Hicks & Associates Employee Stock Ownership Trust ("Trust").  The claims include, but are not limited to, those matters at issue in the Complaint filed on July 8, 2019 by First American Bank (the "Bank") as Case No. 1:19-cv-04594 in the United States District Court Northern District of Illinois Eastern Division (the "Lawsuit") and to such additional claims as enumerated below.

This letter is notification to the Sellers pursuant to Section 16(d) of the June 30, 2017 SPA of the Company's claims (and to the extent applicable claims of the ESOP Trustee) for indemnification against the Sellers commencing of the 90 day period to seek settlement of the Company's (and the ESOP Trustee's) claims against the Sellers. If no satisfactory settlement is reached the Company intends to proceed to arbitration pursuant to section 26.

Howard Levine
John A. Simon
September 30, 2019
Page 2

The Claim as stated herein arises out of the transactional documents executed by Jane Wheeler ("Ms. Wheeler") as President of the Company as well as the loan guaranties executed by Ms. Wheeler and Diane Gaynor ("Ms. Gaynor"). The purpose of the transaction evidenced by the June 30, 2017 documents was to provide financing for the sale of the stock from Ms. Wheeler and Ms. Gaynor to the Trust in June of 2017 ("the 2017 SPA").

In addition to the Bank providing financing for the sale of the stock from Ms. Wheeler and Ms. Gaynor, FBTS brokered the sale and Prairie Capital Advisors, Inc. ("Prairie") conducted an appraisal of the Company's value in order to set the sale price of Sellers' shares of stock in the Company, resulting in the Company's borrowing obligations to both the Bank and the Roni Hicks & Associates Employee Stock Ownership Plan ("ESOP") and to the Sellers.

As discussed herein, it is undisputed that the sale price for the purchase of the Sellers' stock was too high and this has resulted in an unrealistic imposition on the Company's cash flow, ultimately resulting in the filing for Chapter 11 protection. Some evidence that parties do not dispute these facts is that Sellers have tendered and Bank has accepted $2,000,000 (Sellers' guarantee) to the Roni Hicks' note to Bank, since the time the Company filed for bankruptcy.

Further, it is clear that prior to the closing of the 2017 SPA, there were clear indicia that the projections of future business made by the Sellers were grossly overstated resulting in the excess valuation of the stock and other problems which made the sale extremely imprudent from the position of the Company and the ESOP Trustee. These indicia and problems were known to the Sellers and should have been known by FBTS, Prairie, and the Bank and as a result, each of these parties bears some liability to the Company. However, the purpose of this letter is to notify Sellers of the Company's Claim for indemnity in a timely manner under section 16 of the 2017 SPA as amended in June 2019.

## I.  THE ORIGIN OF THE BANK DEBT IN THE 2017 SPA TRANSACTION

Roni Hicks notes a factual outline of the 2017 SPA is laid out in ¶¶6-21 of the Declaration of Aaron Smith, DN 9-3, as filed with the bankruptcy case on August 8, 2019. Specifically, the Company made a note in favor of the Bank for $7,500,000 (along with a loan and security agreement) and the loan was supposed to be repaid at the rate of $89,285.21 in principal, along with interest, each month. The Sellers, for their part, executed guaranties to the Bank of the Company's indebtedness – $1,500,000 in Ms. Wheeler's case and $500,000 in Ms. Gaynor's.  .

Section  ¶16 of the 2017 SPA obligates the Sellers to indemnify the Company and the ESOP "for any loss, cost, expense, or other damage ... suffered by the Company or by the Trustee [ESOP] resulting from, arising out of, or incurred with respect to: (I) the falsity or the breach of any representation, warranty, or covenant made by the Sellers in this Agreement." Paragraph 6.5(b) of the same document attested the accuracy of the financial statements associated with the SPA.

Howard Levine
John A. Simon
September 30, 2019
Page 3

In addition to the indemnities, both the 2014 SPA (Section 25) and the 2017 (Section 27) required the Sellers to pay their own costs regarding the stock sales. Nevertheless, Roni Hicks paid Brookwood Vance (the Sellers' appraiser) $38,000 and it paid $443,000 in legal fees to Morgan, Lewis, Brockius for work which benefitted the Sellers far more than the Company. These amounts are owed to the Company by the Sellers as a direct claim.

## II. THE STOCK PRICE WAS OVERVALUED, LEADING TO RONI HICKS TAKING ON FAR TOO MUCH DEBT

Before the ESOP could purchase the Sellers' shares in 2017, a price had to be set – the resulting per share valuation was supposed to reflect the going concern value of the Company. Prairie set this value by taking a completed business year's cash income and discounting the expected future receipts to reflect the uncertainties of the market in which Roni Hick operates. Prairie's resulting "enterprise value" appraisals showed the per share price of the stock in June 2017 should be $164.00. This number yielded, in turn, the total amounts the Sellers were to be paid for their shares and consequently the size of the loan the Company had to borrow from the Bank (as indicated above, $7,500,000). In addition to the obligation to the Bank the Sellers received promissory notes, respectively Wheeler $1,677,384.48 and McCue $558,886.51 as a result of the per share value stated by Prairie. This further adversely effecting the Company's finances.

It is notable that Prairie produced such appraisals (which ran into the many dozens of pages) for December 2016, June 2017 and December 2017. The Company was provided copies of the December 2016 and December 2017 appraisals, Prairie did not produce the full June 2017 appraisal to either the Company or the ESOP Trustee until recently following repeat demands made by the successor ESOP Trustee.

The evidence the 2017 SPA price was too high, along with the debt the Company took on, accumulated quickly after the SPA closed June 30, 2017. Notably, in six months, (June to December 2017) Prairie's price per share valuation had dropped from $164 to $1. Additionally, there was a peculiar quality in the hypothetical cash flow discounts Prairie had used to come up with the $164 per share figure (See pages 6-8 of Delgleish Power Point Exh. A).

Sellers were provided in March 2019 notice by the Company of the over valuation. That presentation was made by the then President Aaron Smith, Controller Janis Strockis, and Board Member J. Martin Dalgleish, supported by a power point presentation. A copy of that power point presentation is attached hereto as "Exhibit A" as created by Mr. Dalgleish, entitled "RHA The Way Forward Thoughts" consists of 17 slides, sets forth a discussion of valuation claims of the Company.

Howard Levine
John A. Simon
September 30, 2019
Page 4

At the time of the 2014 SPA, Prairie applied a 15.5% cash flow discount; when Prairie again valued the company in December 2016, it used a 16.5% discount. Nevertheless, six months later, at a time when the Company was taking on a very large amount of debt and changing over its entire management team, Prairie lowered the future cash flow discount to 15.5%, meaning the price per share estimate came out higher than it should have (and the estimate of the future hazards to the Company came out too low). As discussed below, there was additional information about adverse events before the 2017 SPA closed which should have led Prairie to a far more conservative valuation of the stock. There existed issues adversely effecting the future of the customer contracts that Sellers should have disclosed to all parties to the June 2017 transaction.

The over-valued loan has meant Roni Hicks made excessively high monthly payments to the Bank. This meant a loss of available cash the Company could otherwise have used to operate and promote its business operations. This meant the Company suffered in a continual cash poor condition and it meant the Company lost valuable customers as it has not been able to induce them to stay, a situation which started before the bankruptcy filing and has accelerated since seeking the protection of the Bankruptcy Court.

Simply put, if the share price had been lower and more reasonable, so too would the amount of the Bank loan. Roni Hicks' monthly borrowing and operating costs would have been lower, leaving more cash available for the Company's operating capital needs.

## III. ADDITIONAL DAMAGES FROM THE 2017 SPA

Aside from the financial drag on the Company and the lost opportunities, the 2017 SPA and loan led to at least two further forms of damage. First, with respect to the per share value of the stock already owned by the ESOP and, second, regarding the Company's employee 401(k) plan.

As all the parties are aware, the Sellers transferred the first 49% of their shares in Roni Hicks to the ESOP through a Stock Purchase Agreement in 2014. Logically, if the remaining 51% of the stock had a value of $164 per share in June 2017, so too did the shares already held by the ESOP. As indicated above, the Company believes $164 per share was too high – but the shares already held by the ESOP had some value before the 2017 SPA. Because the 2017 SPA led to the taking on of extremely high debt to the Bank, the sale of the 51% of the Sellers' shares led directly to making the Company insolvent with the result the original 49% of shares became effectively valueless within six months.

As for the 401(k), the Bank is the administrator of this plan. It had been the Company's practice each year to make an employer contribution of 6% of the employee salaries to the 401(k). Nevertheless, toward the end of the 2018 calendar year, when the Company's financial distress from the 2017 SPA had become apparent, the Bank intervened with the management, as both lender and 401(k) administrator, declaring it would not permit the Company to make the 2018

Howard Levine
John A. Simon
September 30, 2019
Page 5

401(k) contribution.  As explained above with respect to poor cash flow in general, this failure to
make the 401(k) contribution put Roni Hicks at risk of losing and/or maintaining valuable and
talented employees.

## IV.  THE INDICATORS REGARDING OVERVALUATION IN THE 2017 SPA

Roni Hicks believes it is clear the Sellers, the Bank, FBTC and Prairie knew, or should
have known before the 2017 sale closed, that the stock price was too high, meaning the
acquisition loan from the Bank was too high and the Company would be unable to sustain
payments on that loan and/or remain within the stated debt ratio.  The indicators in question fell
into two areas:  First, the Sellers knew about the impending loss of the Company's key client
before the 2017 SPA.  Second, the transaction included self-dealing by the Sellers (known to the
Bank, FBTC and Prairie) and a number of peculiarities uncommon in a sale and loan deal of the
type and size of the SPA.  The Company asserts that Sellers actions are breaches of warranties
provided and numerated in section 6.5(a) and (b) and 6.6.  Company holds direct claims against
the Sellers and seeks indemnity for claims asserted by the Bank and others against the Company.

### A.  Loss of Newland Business

Prior to 2017, 60 to 65% of Roni Hicks' sales each year came from its largest marketing
customer, Newland Communities (and leader in it's industry that other customers follow).  Those
sales came from the Company's longstanding working relationship with Newland's chief
marketing officer, Teri Slavic-Tsuyuki.  However, in early 2017, Newland terminated Ms. Slavic-
Tsuyuki's employment and the remaining Newland management began canceling contracts with
Roni Hicks.  These were facts know to Sellers before June 30, 2017.

It does not matter why Newland elected to sever Ms. Slavic-Tsuyuki's employment or why
it began cancelling its Roni Hicks contracts.  What matters is that several months before the 2017
SPA closed, the Sellers, who were still in control of Roni Hicks' operations, knew the existing
Newland business was being withdrawn and the likelihood of the Company getting future
contracts from Newland was very unlikely to occur.

Especially problematic for the Sellers on the Newland point is ¶6.11 of the 2017 SPA
stated there had been no contract cancellations by any of the Company's clients.  Ms. Wheeler
signed this document on Roni Hicks' behalf as its president.

The Company believes the Sellers failed to inform Prairie (as the appraiser), FBTC (as the
broker) and the Bank (as lender) before the 2017 SPA closed that it was already on the way to
losing upwards of sixty percent of its income base.  To the extent Prairie, FBTC or the Bank (or
individual officers of the Bank) did know about the loss of Newland, it is self-apparent each of
them acted wrongfully by not postponing the sale and requiring a reappraisal/new evaluation.  But

Howard Levine
John A. Simon
September 30, 2019
Page 6

in any event, the Company, Roni Hicks also believes if these parties did not know, that Prairie, FBTC, and the Bank would have been able to have learned the relevant information if they had performed a due and diligent inquiry.

### B. Self-Dealing and Lax Appraisal, Brokerage, and Lending Practices

The Sellers' self-dealing took several forms, each of them known or knowable to Prairie, FBTC and the Bank at the time of accelerated payment of 2014 acquisition loan:

- The Sellers had, of course, pledged securities accounts they had at TD Ameritrade to secure the Bank's acquisition loan to Roni Hicks with respect to the 2014 SPA of the first 49% of shares. That loan had been for $5,500,000 and the full term of the note ran from 2014 to 2019.

- Under the Sellers' direction, the Company used significant amounts of its cash flow in 2015, 2016, and the first half of 2017, to accelerate the pay off of the 2014 acquisition loan. Notably, between December 2016 and June 2017, the Sellers caused the Company to pay out $1,500,000 to the Bank on the 2014 loan.

- The accelerated payment of the 2014 loan was, of course, known to the Bank and it would have been known to FBTC and Prairie through a diligent inquiry as it was reflected in Roni Hicks' financial reports.

- The accelerated pay down of the 2014 loan debilitated Roni Hicks by draining vital cash reserves stunting the growth and development of business operations while directly benefitting the Sellers by allowing Sellers to obtain releases of the Bank's liens against their TD Ameritrade accounts and by creating a false appearance of financial strength of Roni Hicks Operations.

To the extent Company is liable to Bank, Company asserts it is entitle to indemnity of Sellers resulting from their action of financial benefits each received above.

### C. Ms. Wheeler Acted for Her Own Benefit at the Time She Was an Officer of the Company

Ms. Wheeler executed the 2017 stock purchase agreement on her own behalf as seller and on Roni Hicks' behalf as its CEO. Ms. Wheeler likewise signed the June 30, 2017 loan and security agreement and the promissory note in favor of the Bank on behalf of Roni Hicks as its CEO. Of further note, Ms. Wheeler's adult daughter (who was otherwise unconnected to the Company operations) had been appointed to sit on the Company's board of directors and she voted in favor of the 2017 SPA when it was presented to the Board.

Howard Levine
John A. Simon
September 30, 2019
Page 7

These actions by Ms. Wheeler were, again, known to or knowable by Prairie, FBTC and the Bank, and as result Company is entitle to indemnify from Sellers for claims of the Bank.

### D. Laxity in appraisal, brokerage and banking

The Company submits it is self-apparent Prairie, FBTC, and the Bank did not do adequate inquiries into the Company's books and business based on all the foregoing.

The Bank did not act in accordance with generally accepted risk standards in making the 2017 acquisition loan and Sellers actions leading up to the lending event contributed over to encumbering of the Company.  It's the Company's position that Sellers engaged in a course of conduct, including breaching expressed warranties set forth in paragraphs 5, 6.3 (c) and 6.11 of the 2017 SPA which resulted in an over valuation of the stock and resulting in loan obligation to Bank, which the Company has been unable to service.

Specifically, the Bank lent $7,500,000 (and an additional $350,000 in a revolving credit line) in 2017 but only required $2,000,000 worth of guaranties from the Sellers. [The Bank was (and is) unsecured as to the remaining $5,500,000 – the collateral the Bank did obtain from the Company consists of what evanescent assets such as accounts receivable, as opposed to more typically solid business assets such as patents, copyrights, software licenses, or manufacturing equipment or real estate (Roni Hicks does not, of course, own any of these more tangible assets).

## V.  THE ERISA PROBLEM

We will discuss the liabilities the Sellers, et al. may have in more detail below.  But on the matter of the mis-valuation of the shares sold in the 2017 SPA, we simply note that even without any intentional wrongdoing, the stock undervaluation by itself may have been an ERISA violation, subjecting the whole transaction to being overturned on that basis.

## VI.  ABSENT SETTLEMENT, RONI HICKS EXPECTS TO LITIGATE ITS CLAIMS AGAINST THE SEVERAL PARTIES

We believe Roni Hicks has claims against the Sellers, counter-claims against the Bank and third party claims against, FBTC and Prairie.  If the Company is required to file claims before an arbitrator (or in one or more adversary proceedings in the San Diego Bankruptcy proceeding of the Company), those claims will be made:

Claims against Ms. Wheeler and Ms. Gaynor exist under the indemnity clauses of the 2017 SPA in an amount not less than $6,300,000 made pursuant to ¶16(b)(ii) of the 2017 SPA.

Howard Levine
John A. Simon
September 30, 2019
Page 8

Further claims against Ms. Wheeler will be made for breach of fiduciary duty for:
1.  failing to disclose the loss of the Newland account prior to closing of the 2017 SPA;
2.  the paying down the 2014 SPA too quickly in Spring 2017 (which was not in the Company's best interest as set forth above);
3.  Sellers self-dealing in execution of the 2017 SPA documents; and
4.  and for continued self-dealing as a member of the Board of Directors for the period early 2017 to August 2019.

Additional claims to be made in an arbitration (or to be filed as an adversary complaint) against Sellers for indemnity, will be made as claims are pursued against FBTC and Prairie and Bank under the ERISA standards for failing to do an adequate appraisal of the Company's value before the closing of the 2017 SPA and ignoring the Sellers' obvious conflicts of interest in the sale transaction.

We are aware from the Complaint of the Bank, it contends Roni Hicks holds no claims or defenses based on the supposed waiver in the March 2019 forbearance agreement. Without going into the merits of this question at present, suffices it to say Roni Hicks disagrees; and so Sellers are on notice.

## VII.  A SETTLEMENT PROPOSAL

1.  Roni Hicks' loan obligation on the 2017 SPA will be lowered from the $6,865,627.26 stated in the Bank's July 8, 2019 complaint to $2,000,000 and this lowered amount will not be augmented by any of the unpaid interest, fees, or legal costs (including attorney's fees) complained of by the Bank.

2.  It will be up to the Bank, Ms. Wheeler, Ms. Gaynor, FBTC and Prairie to apportion the remaining $4,965,627.26 (and the attendant interest, fees, and legal costs) among themselves.

3.  In exchange for the debt reduction, Roni Hicks will release the indemnity and direct claims it holds against the Sellers and the other claims it may hold against the Bank, FBTC and Prairie.

In the event a satisfactory resolution cannot be reached, the Company intends to proceed defending itself in the Chicago District Court case, part of which will entail counter-claims against the Bank and third party claims against the Sellers, FBTC and Prairie and arbitrating claims as set forth herein.

Howard Levine
John A. Simon
September 30, 2019
Page 9


We believe we have laid out colorable claims and defenses with respect to the Sellers, the Bank, FBTC and Prairie.

We therefore hope this letter will receive your careful consideration and that Sellers will reconsider your resistance to the idea of settlement these disputes.

Sincerely,
LAW OFFICE OF WILLIAM P. FENNELL, APLC


/s/William P. Fennell


William P. Fennell


WPF/cfb
cc:

|  | TO THE SELLERS: | TO THE TRUSTEE |
|---|---|---|
| Larry A. Goldberg, Esq.<br>**ESOP Law Group**<br>244 California Street, Suite 300<br>San Francisco, CA 94111 | Jane Carey Wheeler and Stephen W. Wheeler<br>1206 Caminito Graciela<br>Encinitas, CA 92024 | First Bankers Trust Services, Inc.<br>2321 Kochs Lane<br>Quincy, Illinois 62305-4005<br>Attention: RHA AccountOfficer |
| Prudent Fiduciary Services, LLC<br>100 N. Barranca St., Suite 870<br>West Covina, CA 91791<br>Attention: Miguel Paredes | Diane L. Gaynor-McCue and Steven F. McCue<br>2901 Amigo Drive<br>Lake Havasu City, Arizona 86404 | Schatz Brown Glassman LLP<br>1007 Farmington Avenue – Suite 4<br>West Hartford, CT 06107<br>Attention: Robert Schatz |
| First Bankers Trust Services, Inc.<br>2321 Kochs Lane<br>Quincy, Illinois 62305-4005<br>Attention: Roni Hicks & Associates Account<br>Officer | Morgan, Lewis & Bockius LLP<br>77 West Wacker Drive<br>Chicago, Illinois 60601<br>Attention: Brian Hector | |



EXHIBIT C

Exhibit C - Page 39

PFS    PRUDENT FIDUCIARY
S E R V I C E S

Exhibit C - Page 40

September 30, 2019

**Via Email & FedEx**

Jane Carey Wheeler
Stephen W. Wheeler
Diane L. Gaynor-McCue
Steven F. McCue
c/o Howard Levine
Drinker Biddle & Reath LLP
191 N. Wacker Dr., Ste. 3700
Chicago, IL 60606

Jane Carey Wheeler
Stephen W. Wheeler
1206 Caminito Graciela
Encinitas, CA 92024

Diane L. Gaynor-McCue
Steven F. McCue
2901 Amigo Dr.
Lake Havasu City, AZ 86404

> RE:    Roni Hicks & Associates Employee Stock Ownership Plan
> Trustee's Written Notice to Assert Right of Indemnification

Dear Ms. Wheeler, Mr. Wheeler, Ms. Gaynor-McCue, and Mr. McCue:

I, Miguel Paredes, am the current and successor trustee (the "Trustee") of the Roni Hicks & Associates Employee Stock Ownership Trust (the "Trust"), which forms part of the Roni Hicks & Associates Employee Stock Ownership Plan (the "Plan" or "ESOP").

This letter serves as written notice of my assertion of an indemnification claim made as of September 30, 2019, as the ESOP's Trustee and on behalf of the ESOP and its participants and beneficiaries, against Jane Carey Wheeler, Stephen W. Wheeler, Diane L. Gaynor-McCue, and Steven F. McCue (the "Sellers"), pursuant to the Stock Purchase Agreement dated June 30, 2017 by and among the Sellers, IntegratedMarketing.com d/b/a Roni Hicks & Associates (the "Company"), and First Bankers Trust Services, Inc., the predecessor trustee of the Trust (the "Predecessor Trustee"), as well as Amendment No. 1 to the Stock Purchase Agreement dated June 21, 2019 executed by the Sellers, the Company, and me, in my capacity as the successor trustee of the Trust (together, the "Stock Purchase Agreement").

After reviewing the circumstances surrounding the June 30, 2017 purchase of Company stock by the ESOP (the "2017 ESOP Transaction"), I have determined that the following representations,

Exhibit C - Page 40

warranties, and/or covenants contained in the Stock Purchase Agreement were breached on the part of the Sellers:

- Section 6.6: "<u>Interim Operations</u>. Except for agreements entered into and liabilities incurred in connection with the establishment of the Plan and the financing of the purchase and sale of the Shares contemplated by this Agreement, since December 31, 2016: (a) the business of the Company has been carried on in the usual course; (b) there has been no material adverse change in the financial condition, results of operations, assets, liabilities, business, or prospects of the Company; and (c) there has been no other material change in the financial condition, results of operations, assets, liabilities, business, or prospects of the Company, except in the ordinary course of business."

- Section 6.11: "<u>Contracts</u>. All of the contracts to which the Company is a party (the "Contracts") are valid, binding, and enforceable according to their terms; there is no default or event that with notice or lapse of time, or both, would constitute a default by any party to any of the Contracts; the Company has not received any notice that any party to any of the Contracts intends to cancel or terminate any of the Contracts; and the Company is not a party to or bound by any agreement that is materially adverse to the business or financial condition of the Company."

- Section 6.21: "<u>Pre- and post-Transaction Solvency</u>. The Company is and, after giving effect to the transactions contemplated by this Agreement, the Company's making of the ESOP and Seller Loans to the Trustee to enable the Trustee to purchase the Shares and the Company's receipt of loans from First American Bank for the purpose of, among others, funding the ESOP Loan, referred to herein as the "transactions contemplated by this Agreement"), will be: (a) in compliance with the requirements of Sections 500-509 of the California Corporations Code based on the most recent financial statements available to the Sellers at the time of Closing Date, (b) the Company's working capital is adequate to meet its current and projected obligations to creditors as and when they become due; and (c) the Company will not be left with an unreasonably small amount of capital with which to meet its obligations."

- Section 6.22: "<u>Disclosure</u>. None of the representations or warranties made by the Sellers in this Agreement, and none of the statements made in the Disclosure Schedule or any document furnished pursuant to this Agreement, contain any untrue statement of a material fact, or omit to state any material fact necessary in order to make the statements contained herein or therein not misleading."

After examining the 2017 ESOP Transaction, which included reviewing information and documentation relating to the transaction and conducting interviews with several of the principal parties involved in the transaction, I have determined that certain information was not appropriately and/or sufficiently disclosed by the Sellers to the Predecessor Trustee relating to the status of one of the Company's key clients, Newland Communities, and the Company's financial outlook as a result of the change in this client's status. Based on my review of the 2017 ESOP Transaction, I have determined that the information that was not disclosed appropriately and/or sufficiently was known and/or knowable at the time of the 2017 ESOP Transaction.

Moreover, such information concerned a material adverse change in the financial condition and prospects of the Company; involved a party to a Company contract and its intent to cancel or terminate its contract; would have indicated an issue with the Company's post-transaction solvency based on the Stock Purchase Agreement terms as executed; and involved material facts necessary to support the terms of the Stock Purchase Agreement as executed.

As Trustee, I have determined that due in significant part to the Sellers' breaches of the aforementioned representations, warranties, and/or covenants in the Stock Purchase Agreement, the 2017 ESOP Transaction was based on an overstatement of value of the Company, which resulted in the ESOP paying more than fair market value for the stock. This loss to the ESOP has been calculated by the Trustee to be between $4,236,000 and $4,447,000.

As Trustee, I acknowledge that this claim shall be resolved pursuant to the procedures outlined in the Stock Purchase Agreement in Sections 16(d) and 25, and any other relevant sections.

Please contact me if you would like to further discuss this matter.

Sincerely,

Miguel Paredes, not in his individual or corporate
capacity, but solely in his capacity as Trustee of the
Roni Hicks & Associates Employee Stock
Ownership Plan and associated Trust

Cc:    Morgan, Lewis & Bockius LLP
       77 West Wacker Drive
       Chicago, IL 60601
       Attention: Brian Hector

3

**Exhibit C - Page 42**

EXHIBIT D

**prairie capital**
▓▒■ advisors, inc. ■▓▒
an employee owned company

|  |  |
|---|---|
| **Headquarters** | 425 Second Street SE ▪ Suite 1225 |
| One Mid America Plaza ▪ Suite 1000 | Cedar Rapids, IA 52401 |
| Oakbrook Terrace, IL 60181 | 319.364.0315 |
| 630.413.5565 | |
| 3715 Northside Parkway ▪ Building 200 - Suite 675 | 125 South Wacker Drive ▪ Suite 300 |
| Atlanta, GA 30327 | Chicago, IL 60606 |
| 404.809.2440 | 312.348.1323 |
| 225 Franklin Street ▪ Suite 2600 | 100 North 18th Street ▪ Suite 300 |
| Boston, MA 02110 | Philadelphia, PA 19103 |
| 617.758.1001 | 215.246.0269 |

March 31, 2017

First Bankers Trust Services, Inc.
Not in its corporate capacity but solely in its capacity as
Trustee of Roni Hicks & Associates, Inc.
Employee Stock Ownership Trust
2321 Koch's Lane
PO Box 4005
Quincy, IL  62305-4005

Dear Trustee:

## Description of the Engagement

Prairie Capital Advisors, Inc. ("Prairie") is pleased to submit our proposal to conduct a valuation and related transaction analysis of Roni Hicks & Associates, Inc. ("Roni Hicks" or the "Company") on behalf of the ESOP Trustee. It is our understanding that the ESOP Trustee ("You" or the "Client") wishes to evaluate a transaction whereby the Roni Hicks Employee Stock Ownership Plan ("ESOP") may purchase all of the remaining non-ESOP common stock shares. As of December 31, 2016, the last ESOP yearend date, the ESOP owned 49.0% of the issued and outstanding common stock in the Company. The contemplated transaction will result in the ESOP owning 100% of the issued and outstanding common stock of Roni Hicks on a post transaction basis (the above referenced transaction is referred to herein as the "Transaction").

## Scope of Work

You have requested our proposal to undertake a series of ESOP-related services as described below:

1.  Estimate the fair market value of the Company's stock, considering the Company as an ongoing enterprise. We will develop our valuation conclusion on a controlling interest premise of value based upon the size of the block of stock expected to be redeemed by the Company in the contemplated Transaction. The term "Fair Market Value" (as such term is used for adequate consideration purposes under section 3(18) of ERISA) is defined as the amount at which the ESOP Shares might exchange between a willing buyer and a willing seller assuming terms similar to those reflected in the ESOP Purchase, each having reasonable knowledge of all relevant facts, neither being under compulsion, and with equity to both parties.  The Appraisal Report will comply with IRS Revenue Ruling 59-60 addressing general valuation criteria, the U.S. Department of Labor Proposed Regulations, Section 2510.3-18(b)(2) AND (4), 53 F.R. 17632 (May 17, 1988), as well as the requirements by the American Society of Appraisers.

2.  Render a Fairness opinion to the ESOP Trustee. This opinion will address whether the Transaction is fair to the ESOP Trust from a financial point of view in the context of the Transaction taken as a whole.




www.prairiecap.com
*Securities offered through Prairie Capital Markets, LLC*

First Bankers Trust Services, Inc.
Trustee of the Roni Hicks & Associates, Inc. ESOP
Page 2

## Valuation Approaches

In conducting our analysis and in the development of our valuation reports and opinion letters, we will consider various approaches deemed to be appropriate in estimating the value of the Company and its securities. These approaches may include:

### Income Approach

The income approach is a general way of determining a value indication of a business, business ownership interest, security or intangible asset using one or more methods that convert anticipated economic benefits into a present value. The Discounted Cash Flow ("DCF") analysis is a method within the income approach whereby the present value of future expected free cash flow is calculated using a discount rate. If projected financial results are not available or if the future earnings capacity of the Company cannot be estimated, the capitalization of income method would likely be more appropriate than the DCF method. The capitalization of income method is based on the Gordon Growth Model, whereby a single period's earnings are capitalized into perpetuity. The capitalization rate can be estimated based on a company's discount rate and its estimated long-term terminal growth rate.

### Market Approach

The market approach is a general way of determining a value indication of a business by using one or more methods that compare the subject company to similar business, business ownership interests, securities, or intangible assets that have been sold. The guideline public company method is a method within the market approach that (a) assesses the attractiveness of the subject company as an investment relative to a group of similar, publicly traded companies and (b) applies valuation multiples derived from the guideline companies to the subject company's earnings. The guideline transaction method is another commonly used method of the market approach. The primary focus of the transaction method is to examine the terms, prices, and conditions found in sales of companies in the subject's respective industry. After relevant transactions are identified and analyzed based on various criteria, transaction multiples are derived and applied to the earnings of the subject company in order to estimate its implied value.

### Asset Approach

The asset approach derives value by an analysis of the individual assets and liabilities comprising the business. In this approach, the tangible and intangible assets of the business are individually appraised using the asset-based, market, and income approaches. The asset-based approach involves estimation of the current reproduction cost of the asset, less an estimate of accrued depreciation to reflect physical, functional, and economic obsolescence. This approach is usually not applied in the valuation of a going concern entity.

## Timing, Reports, and Professional Fees

Prairie plans to commence our analysis upon delivery of the items listed on the information request form. Upon completion of our analysis, Prairie will deliver a conclusion within a narrative report. The report will include a discussion of the Company's history, prospects, current financial condition and performance, and a thorough description of the valuation approaches employed.

First Bankers Trust Services, Inc.
Trustee of the Roni Hicks & Associates, Inc. ESOP
Page 3

Based on our understanding of the scope of the engagement as described herein, our fee to complete this engagement is estimated to be **$50,000 to $55,000** with $30,000 due by the Company and deemed earned upon execution of this letter. The balance of the fee will be due on the Closing Date.

Any other services authorized and provided that go beyond the scope of this engagement as set out above will be invoiced in addition to the fees noted above. These additional fees are based on the time spent in responding to the request using the then-prevailing hourly rates for the staff providing the service. The current prevailing hourly rates for our staff are in the range of $120 to $465 per hour. Any incremental fees will be due and payable as invoiced at the closing or termination of the engagement. In the event the client terminates this engagement before completion, Prairie will send a final invoice for hours beyond the retainer amount at the current prevailing hourly rates.

In addition, to the fees mentioned above, the Company will be invoiced for all travel, living and other incidental out-of-pocket expenses including but not limited to market data research and requested printed copies of our report, incurred by our staff in completing the engagement.

Accounting firms have begun to adopt standards that require them to review our valuation procedures and methodology. In our experience, this may involve participation in conference calls and/or production of written responses to their questions and the amount of such effort varies widely from situation to situation. The additional time spent in complying with their requests (if any) is not part of the fee quoted and, therefore, will also be invoiced to you at the then-prevailing hourly rates for the staff involved.

## Engagement Terms and Conditions

In completing this engagement, we will rely on information provided by the Client and the Company including, but not limited to, financial statements, projections, product information, facilities descriptions, employee data, and other information as may be requested. We will accept this information as being accurate without independent verification. Notwithstanding the foregoing, we will not rely on any information which we believe to be inaccurate, incomplete or misleading.

Prairie Capital Advisors, Inc. will act as an independent contractor. Our fee is not contingent in any way upon our conclusions of value.

Prairie's report and opinion letters are valid only for the purpose stated herein. You agree that you will not reference our name, or our report, in whole or in part, in any document distributed to third parties without our prior authorization that shall not be unreasonably withheld. A copy of our opinion letter can be delivered to your legal counsel, and may be used by your counsel in rendering opinions it may be asked to give in connection with the Transaction.

In the event of consummation of any transaction or engagement, Prairie shall have the right to disclose its participation in such transaction or engagement, without limitation, for general marketing purposes. Prairie agrees not to disclose any nonpublic, confidential, or proprietary information in such announcement. Prairie represents that it has exercised all reasonable measures to ensure the confidentiality of all Company affairs and information.

First Bankers Trust Services, Inc.
Trustee of the Roni Hicks & Associates, Inc. ESOP
Page 4

Notwithstanding the fact that You are the Client of record, by signature below the Company is obligated to pay all fees and reimbursable expenses referenced in this letter.

The Company agrees to indemnify and hold Prairie, its officers, directors, and employees harmless against any and all liability, claim, loss, cost, and expense, of whatever kind or nature, which Prairie may incur, or be subject to, as a party, expert witness, witness or participant in connection with any dispute or litigation involving the Company or the Client unless such liability, claim, loss, cost, an expense, of whatever kind or nature, is due to the negligence or willful misconduct of Prairie and any such negligence is not caused by, or the result of inaccurate or misleading information provided to Prairie by the Company.

In the event Prairie should find it necessary to retain an attorney for the enforcement of any of the provisions of the Engagement occasioned by the fault of Client or Company, Prairie shall be entitled to recover reasonable attorney's fees and court costs incurred as a result thereof, whether said attorney's fees are incurred for the purpose of investigation, negotiation, trial, appellate proceedings or other legal services.

If this letter correctly reflects your understanding of our agreement, we ask that you confirm it by signing the letter as set out below. Please forward the original signed copy to us along with a retainer in the amount of **$30,000** and retain one copy for your files.

Very truly yours,

On Behalf of Prairie Capital Advisors, Inc.
Rocky M. Fiore
Chief Operating Officer

RONI1703A02

For PCA use only

On behalf of the Trustee:

_Dawn Soosterhing_    _Executive Vice President_    _3-31-17_
Accepted by                          Title                                   Date

On behalf of the Company:

_Michael_    _President_    _4/5/17_
Accepted by                          Title                                   Date